1  JOHN E. BIRKENHEIER, IL Bar No. 6270993
   Email: birkenheierj@sec.gov
2  JONATHAN S. POLISH, IL Bar No. 6237890
   Email: polishj@sec.gov
3  ANNE C. McKINLEY, IL Bar No. 6270252
   Email: mckinleya@sec.gov
4  MICHAEL D. WELLS, IL Bar No. 6276155
   Email: wellsm@sec.gov
5  DANIEL S. RYAN, IL Bar No. 6279737
   Email: ryand@sec.gov
   **United States Securities and Exchange Commission**
6  175 West Jackson Boulevard, Ninth Floor
   Chicago, Illinois 60604
7  Telephone: (312) 353-7390
   Facsimile: (312) 353-7398
8
   LOCAL COUNSEL
9  JOHN B. BULGOZDY, Cal. Bar No. 219897
   Email: bulgozdyj@sec.gov
10 **United States Securities and Exchange Commission**
   5670 Wilshire Boulevard, Eleventh Floor
11 Los Angeles, California 90036
   Telephone: (323) 965-3998
12 Facsimile: (323) 965-3908
   Attorneys for Plaintiff
13

14
                    **UNITED STATES DISTRICT COURT**
15
                    **CENTRAL DISTRICT OF CALIFORNIA**
16
                         **WESTERN DIVISION**
17                       SACV12    633 JST (MLbx)
18

19 | UNITED STATES SECURITIES AND    | Case Number:
   | EXCHANGE COMMISSION,            |
20 |                                 |
   |                    Plaintiff,   | The Honorable
21 |                                 |
   |           vs.                   |
22 |                                 | **COMPLAINT FOR VIOLATIONS
   | OPTION ONE MORTGAGE             | OF THE FEDERAL SECURITIES
23 | CORPORATION n/k/a SAND CANYON   | LAWS**
   | CORPORATION,                    |
24 |                                 |
   |                    Defendant.   | JURY TRIAL DEMANDED
25

26

27

28

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

I.   **JURISDICTION AND VENUE**

1.   The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b), 77t(d)].

2.   This Court has jurisdiction over the action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

3.   Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

4.   Option One Mortgage Corporation n/k/a Sand Canyon Corporation ("Option One") resides in and may be found in this District.  Option One also transacted business in this District and, in connection with certain of the acts, transactions, and courses of business described in this Complaint, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in this District.

II.   **SUMMARY**

5.   This case concerns the fraudulent sale of residential mortgage-backed securities ("RMBS") by Option One.

6.   Option One was one of the country's largest subprime lenders.  In its fiscal year 2006, Option One originated nearly $40 billion in subprime mortgage loans.

7.   From on or about January 24, 2007 through March 12, 2007, Option One sponsored over $4.3 billion of RMBS in seven separate offerings.

8.   The offering documents for the RMBS represented to investors that Option One was obligated to repurchase or replace any mortgage loan in the pools collateralizing the RMBS for which there was a breach of a representation or warranty that materially and adversely affected the value of the loan or the RMBS investors' interest in the loan.   The offering documents also contained risk

1  disclosures that omitted important information about Option One's financial
2  condition.

3       9.    Further, certain Option One senior officers signed agreements and
4  certifications representing that, among other things, they knew of no reasons why
5  Option One would not be able to fulfill its obligations and that the offering
6  documents did not contain any materially misleading statements.

7       10.    In reality, as Option One and its senior officers knew or should have
8  known, Option One was experiencing financial difficulties as a result of the decline
9  in the subprime mortgage market, could not meet its loan repurchase obligations on
10  its own due to its deteriorating financial condition, and needed its parent company,
11  H&R Block Inc. ("Block"), through a subsidiary, to continue providing voluntary
12  financial support to maintain its operations and meet its escalating loan repurchase
13  obligations.

14      11.    The offering documents misled investors about Option One's
15  precarious financial condition and, hence, its inability to fulfill its obligations on its
16  own to repurchase or replace loans for which there were breaches of a
17  representation or warranty that materially and adversely affected the value of the
18  loans or the RMBS investors' interest in the loans.

19      12.    RMBS investors cared about Option One's financial condition
20  because they cared about Option One's ability to meet its repurchase obligations.

21      13.    By using the misleading representations to offer and sell RMBS to
22  investors and engaging in other transactions, practices, and courses of business that
23  operated as a fraud or deceit on investors in each of the seven RMBS offerings,
24  Option One violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15
25  U.S.C. § 77q(a)(2) and (3)].

26  **III.   DEFENDANT**

27      14.    Option One is a California corporation with headquarters in Irvine,
28  California. Option One is an indirect wholly owned mortgage banking subsidiary

3

1  of Block. Between approximately 1993 and 2008, Option One was in the business
2  of originating, sponsoring, selling, and servicing subprime mortgage loans. In
3  2007, Option One established trusts for the purpose of selling RMBS to investors.
4  Option One sponsored each trust, and originated and serviced the mortgage loans
5  contained in each trust. In 2008, Option One changed its name to Sand Canyon
6  Corporation and sold its servicing business.

7  **IV.   OTHER ENTITIES**

8       15.   Option One Mortgage Loan Trusts (the "Trusts") are four New York
9  common law trusts with principal offices in Irvine, California. The Trusts include
10 Option One Mortgage Loan Trust 2007-1 (the "2007-1 Trust"), Option One
11 Mortgage Loan Trust 2007-FXD1 (the "2007-FXD1 Trust"), Option One
12 Mortgage Loan Trust 2007-CP1 (the "2007-CP1 Trust"), and Option One
13 Mortgage Loan Trust 2007-2 (the "2007-2 Trust"). Pooling agreements among
14 Option One, an Option One subsidiary, and a third-party firm (as trustee)
15 established the Trusts. The Trusts did not have any directors, officers, or other
16 employees. They acted only through Option One, an Option One subsidiary, and
17 the trustee.

18       16.   Option One Mortgage Securities Net Interest Margin ("NIM") Trusts
19 (the "NIM Trusts") are three Delaware statutory trusts with principal offices in
20 Wilmington, Delaware. The NIM Trusts include Option One Mortgage Securities
21 NIM Trust 2007-1 (the "2007-1 NIM Trust"), Option One Mortgage Securities
22 NIM Trust 2007-FXD1 (the "2007-FXD1 NIM Trust"), and Option One Mortgage
23 Securities NIM Trust 2007-CP1 (the "2007-CP1 NIM Trust"). Trust agreements
24 among a wholly owned special purpose vehicle of an Option One subsidiary and a
25 third-party firm (as owner trustee) established the NIM Trusts. Upon formation,
26 Option One's special purpose vehicle owned the NIM Trusts. The NIM Trusts did
27 not have any directors, officers, or other employees. At formation, they acted only
28 through the special purpose vehicle, which acted solely through Option One.

## V.   FACTS

### A.   Overview of Option One's RMBS Business

17.   In 2006 and 2007, Option One originated subprime loans and sold them in the secondary market through RMBS securitizations or whole loan pool sales.   Whole loan pool sales involved the sale of an entire pool of subprime mortgage loans to one purchaser.   Option One funded its mortgage originations using credit lines (the "Warehouse Lines") provided by a consortium of financial firms (the "Warehouse Lenders").   Option One's Warehouse Lines were short-term revolving credit facilities that Option One used to originate new subprime mortgages.

18.   When Option One sold the mortgages it originated in a RMBS securitization or a whole loan pool sale, it used the proceeds to pay down the balances on its Warehouse Lines.   From January through March 2007, Option One received more money for its mortgages by engaging in RMBS securitizations rather than whole loan pool sales.   The RMBS securitizations were an integral part of Option One's business.

19.   Generally, the Warehouse Lenders also acted as underwriters (the "Underwriters") for Option One's RMBS securitizations, including the securitizations of the Trusts and the NIM Trusts.

20.   Option One's RMBS were debt obligations that represented claims to the cash flows from pools of residential mortgage loans.   When securitizing a pool of subprime mortgages, Option One utilized a series of wholly owned subsidiaries and trusts.   First, Option One, through its subsidiaries, sold the loans into a trust. That trust then issued RMBS that represented claims on the principal and/or interest payments made by borrowers on the loans in the pool.   A RMBS investor's risk and return were functions of the tranche, or class of RMBS within the trust (*e.g.*, senior/mezzanine/subordinated), that the RMBS investor purchased.   Each tranche had its own credit rating.

21.   Option One retained certain tranches of RMBS from each of its RMBS called "residual interests" ("Residual Interests").   The Residual Interests were unrated and typically consisted of RMBS at the bottom of the capital structure, meaning they typically were the first RMBS to incur losses.

22.   Option One's NIM offerings were securitizations of its Residual Interests.   By engaging in NIM offerings, Option One was able to monetize its Residual Interests.

23.   Before each of the Trusts issued RMBS, offering materials, including a prospectus supplement ("prospectus"), were distributed.   These offering materials contained disclosures, relating to the RMBS, and representations and warranties relating to the mortgage loans collateralizing the RMBS.   Before each of the NIM Trusts issued notes, a private placement memorandum ("PPM") that incorporated by reference the prospectuses of the underlying Trusts was distributed.

24.   The prospectus for each of the Trusts represented that Option One was obligated to repurchase or replace any mortgage loans from the trust for which there were breaches of a representation or warranty that materially and adversely affected the value of the loans or the RMBS investors' interest in the loans. Because of these obligations, Option One faced potentially significant liabilities.

25.   Option One employees put together prospectuses with the help of Option One's outside counsel.   Few changes were made to the disclosures from one securitization to the next.   Option One rarely suggested any changes to the risk disclosures and did not have an adequate process in place for ensuring that the risk disclosures were current.

26.   The prospectuses for the Trusts prominently featured Option One's corporate logo on the cover page.   Moreover, in connection with each Trust, Option One, as sole stockholder, executed a consent ratifying all actions taken by its subsidiaries in connection with issuing the RMBS.   The individuals who signed RMBS documents on behalf of Option One and its subsidiaries did not distinguish

6

1   the work they performed on behalf of Option One from the work they performed

2   for its subsidiaries.

3       27.    In connection with each of the Trusts, Option One and its subsidiaries

4   executed mortgage loan purchase agreements ("MLPAs"), which were required to

5   close the trust and which memorialized both the terms of the sale of the mortgage

6   pool for securitization and the representations and warranties governing the loans.

7   In the MLPAs, which were referenced in the prospectuses and attached to Forms 8-

8   K that an Option One subsidiary, Option One Mortgage Acceptance Corporation

9   ("Option One Acceptance"), filed with the Commission on behalf of each trust,

10  Option One represented that it did not have any reason or cause to believe that it

11  could not perform the covenants set forth in the MLPAs.   The MLPAs provided

12  that Option One shall repurchase or replace those mortgage loans collateralizing

13  the trusts for which there were breaches of a representation or warranty that

14  materially and adversely affected the value of the loans or the RMBS investors'

15  interest in the loans.

16      28.    In connection with each of the Trusts, Option One and its subsidiaries

17  executed underwriting agreements (the "Underwriting Agreements"), which were

18  required to close the trust and which memorialized the representations and

19  warranties provided to the Underwriters and the conditions under which the

20  Underwriters agreed to purchase the RMBS.   In the Underwriting Agreements,

21  which were referenced in the prospectuses and attached to Forms 8-K that Option

22  One Acceptance filed with the Commission on behalf of each trust, Option One

23  represented that the prospectus did not and would not contain any untrue statement

24  of a material fact or omit to state a material fact necessary in order to make the

25  statements therein, in light of the circumstances under which they were made, not

26  misleading.    The  Underwriting  Agreements  also  confirmed  the  parties'

27  understanding that the Underwriters intended to offer the RMBS for sale to the

28  public as set forth in the prospectus.

29.    In connection with each of the Trusts and NIM Trusts, senior officers of Option One and its subsidiaries executed officer certifications (the "Officer Certifications") that were required to close the offerings.  Among other things, the Officer Certifications affirmed that:

(1)    the officer had carefully examined the relevant MLPA, and Option One's representations and warranties in the MLPA were true and correct in all material respects;

(2)    the officer had carefully examined the relevant Underwriting Agreement, and Option One's representations and warranties in the Underwriting Agreement were true and correct in all material respects;

(3)    the officer had carefully examined the prospectus and nothing had come to the officer's attention that would lead the officer to believe that the prospectus contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements made in the prospectus not misleading;

(4)    subsequent to issuance of the prospectus or PPM, there had not been any material adverse change in Option One's financial condition or results; and

(5)    nothing had come to the officer's attention that led the officer to believe that the PPM contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements made in the PPM not misleading.

30.    For each of its offerings, Option One received cash proceeds from the sales of RMBS to investors and retained a Residual Interest.

**B.    Overview of Option One's RMBS Disclosure Process**

31.    Contrary to certifications by Option One's senior officers, Option One's senior officers did not carefully examine the prospectuses, PPMs, MLPAs, and Underwriting Agreements.

32.     Option One did not install or maintain sufficient policies or procedures, or take proper steps to ensure that an Option One employee who knew about Option One's financial condition and its financial relationship with Block reviewed and approved Option One's disclosures in the prospectuses and PPMs before they were distributed to investors.

33.     Before each of the Trusts closed, the Underwriters convened a due diligence call to ensure that all material information was included in the prospectus. At least one Option One employee represented Option One on each due diligence call.

34.     The Underwriters prepared agendas for each of the due diligence calls, which included the following topics:

(1)     Option One's major operational and financial concerns for the next three months;

(2)     adverse developments in Option One's operations or financial condition that were not disclosed in the prospectus for the previous trust;

(3)     any material developments, circumstances, or other facts that the Underwriters should know about before entering the market to sell the RMBS.

35.     During the calls, the participants discussed each topic on the agenda. Option One employees provided a response for each topic before the participants discussed the next topic on the agenda. Although the Underwriters received some financial information in connection with the Warehouse Lines, Option One's reliance upon voluntary funding from Block through a subsidiary was not disclosed on any of these due diligence calls.

**C.     Option One's Source of Funding to Support Its Operations**

36.     When Option One needed cash for its non-origination operating activities, it borrowed money from a Block subsidiary through a line of credit ("Line of Credit"), which carried an interest rate of one month LIBOR plus 250

basis points.  The Line of Credit agreement required funding of only $150 million of borrowings.  Borrowings above $150 million under the Line of Credit were dependent on Block's ability and willingness to provide Option One with the necessary cash because Block was under no obligation to do so.

37.    Option One used the Line of Credit to fund its operating activities.

**D.    Option One's Deteriorating Financial Condition**

38.    Option One's fiscal year runs from May 1 to April 30 with quarters ending on July 31, October 31, January 31, and April 30.

39.    Before fiscal year 2007, Option One was one of the country's largest subprime originators and was generally profitable.

40.    In its fiscal year 2006, Option One originated approximately $40 billion in subprime mortgages.  However, the subprime mortgage market started to decline during Option One's fiscal year 2007 starting in approximately the summer of 2006.  As a result, Option One began experiencing losses and a decline in revenues, including pretax losses of approximately $5 million and $40 million in the first and second quarters of fiscal year 2007 that ended on July 31, 2006 and October 31, 2006, respectively.

41.    In response to these losses, Option One tightened its loan origination underwriting standards in August 2006, December 2006, January 2007, February 2007, and March 2007 by, among other things, requiring prospective borrowers to have stronger credit profiles.

42.    It generally took several weeks before changes to origination underwriting standards would produce a pool of loans using the new standards. Hence, from January 2007 to March 2007, Option One still held large numbers of loans that had been originated under the earlier standards.  The earlier loans made up significant portions of the loan pools that Option One securitized between January 2007 and March 2007.

### 1.    Block's Examination of Strategic Alternatives for Option One

43.    Although Option One was Block's indirect, wholly owned subsidiary, Block never guaranteed Option One's loan repurchase obligations or the Warehouse Lines.

44.    In its November 6, 2006 Form 8-K filed with the Commission, Block announced that it was lowering its fiscal year earnings guidance by over 20% to reflect continued pricing pressures in the mortgage market.  Block also announced that it was evaluating strategic alternatives for Option One including a possible sale or other transaction.  Block simultaneously announced that Option One was closing 12 branch offices to reflect changes in the mortgage market.

45.    Between approximately December 2006 and April 2007, Block negotiated a possible sale of Option One.  Meanwhile, Option One continued operating, including maintaining its Warehouse Lines and absorbing losses on its loan originations.

46.    Option One's mounting losses threatened Block's credit rating, which was placed on credit watch with negative implications on or about March 16, 2007 by Standard & Poor's.

47.    In its April 19, 2007 Form 8-K filed with the Commission, Block announced that it had entered into an agreement to sell Option One for $300 million less than Option One's tangible net asset value at closing.  Block and the tentative purchaser never consummated the sale and they ultimately terminated the purchase agreement on or about December 3, 2007.

### 2.    Option One's First Round of Debt Covenant Waivers

48.    By December 2006, Option One's officers were discussing whether Option One needed to obtain waivers of the minimum net income covenants in the Warehouse Lines for the fiscal quarter ending on January 31, 2007 (the "January Waivers").   The Warehouse Lines were all subject to a minimum net income

covenant that required Option One to maintain a cumulative minimum net income of at least $1.00 for four consecutive fiscal quarters. A breach of that covenant for any of the Warehouse Lines could have resulted in the termination of all of the Warehouse Lines.

49. A violation of any minimum net income covenant would have permitted the Warehouse Lenders to demand that Option One pay off their billions of dollars of outstanding balances on the Warehouse Lines, to terminate future funding obligations, and to terminate Option One's right to service existing loans.

50. By at least January 4, 2007, Option One knew that it likely would need to obtain the January Waivers.

51. On or about January 13, 2007, Option One's outside auditor was advised that Option One would need the January Waivers. By that date, Option One was also considering whether it needed to obtain waivers of the minimum net income covenants in the Warehouse Lines for the fiscal quarter ending on April 30, 2007 (the "April Waivers").

52. Option One ultimately needed to request the January Waivers from each of its Warehouse Lenders. It obtained the January Waivers on or about January 24, 2007. The January Waivers ran from January 24, 2007 through April 27, 2007.

### 3. Concerns About Option One's Financial Condition

53. On or about January 3, 2007, Option One learned that one of the five largest purchasers of Option One's RMBS was concerned about Option One's viability and wanted to know whether Option One could return to profitability.

### 4. Option One's Continued Financial Deterioration

54. On or about February 5, 2007, Option One estimated its pretax net loss for the fiscal quarter ending on January 31, 2007 to be at least $100 million. On that same date, Option One held approximately $5.6 billion in subprime loans on the Warehouse Lines.

55.    Under its agreements with the Warehouse Lenders, Option One could not receive the entire market value of loans it originated using funds from the Warehouse Lines.  The Warehouse Lenders loaned Option One only a percentage of each loan's face value.  The difference, known as a "haircut," constituted cash collateral, or margin.  When the market value of the loans decreased, Option One had to pay the Warehouse Lenders additional margin.

56.    Because of the declining values of the loans on the Warehouse Lines, Option One had to send the Warehouse Lenders approximately $164 million of additional margin by the end of January 2007.  That amount increased to approximately $300 million by the end of February 2007 and approximately $330 million by March 15, 2007.

57.    In February 2007, Option One interacted directly with the Warehouse Lenders in an effort to reduce or delay the margin calls.

58.    In addition to using the Line of Credit to pay repurchase demands, Option One also used money borrowed under the Line of Credit to cover its margin calls.  As a result, the outstanding balance on the Line of Credit ballooned to over $884 million on or about January 11, 2007.  It eventually reached over $1.1 billion on or about March 26, 2007.

59.    Because Option One did not have sufficient funds from its operations to meet all of its growing loan repurchase demands, it used money borrowed under the Line of Credit to help pay repurchase demands.  In fiscal year 2007, Option One used borrowed funds to repurchase approximately $990 million of loans from securitizations and whole loan pool sales and reserved for another approximately $38.4 million of loan repurchases.  Option One generally suffered a loss on the loans it repurchased because it was forced to resell them at a deep discount or commence foreclosure proceedings on the properties that secured the loans.

60.    On or about February 17, 2007, Option One's Chief Financial Officer sent a confidential email to certain Option One senior officers stating that Option

13

1  One did not have its own cash flow and was borrowing hundreds of millions of
2  dollars to fund, among other things, loan repurchases and margin calls.

### 5. Option One's Second Round of Debt Covenant Waivers

3

4  61.    By March 5, 2007, Option One advised the Warehouse Lenders that
5  Option One would likely need the April Waivers.

6  62.    On March 14, 2007, Block filed a Form 10-Q disclosing for the first
7  time Option One's January Waivers and reporting that Option One incurred an $85
8  million net loss in the fiscal quarter ending on January 31, 2007. The filing also
9  disclosed that Option One believed it would violate its minimum net income
10  covenants on April 30, 2007, and acknowledged that, in the absence of the April
11  Waivers, Option One's Warehouse Lenders could, among other things, terminate
12  their future funding obligations under the Warehouse Lines and terminate Option
13  One's right to service the existing loans on the Warehouse Lines.

### E. Option One's RMBS Offerings

14

### 1. The Trusts and NIM Trusts

15

16  63.    The prospectus for the 2007-1 Trust was issued on or about January
17  16, 2007. The 2007-1 Trust closed on or about January 24, 2007. The principal
18  balance of the RMBS issued by the 2007-1 Trust was approximately $1.7 billion.
19  Option One senior officers signed the MLPA, the Underwriting Agreement, the
20  January 18, 2007 Form 8-K to which the MLPA and the Underwriting Agreement
21  were attached, and the Officer Certifications for the 2007-1 Trust. The
22  Underwriting Agreement is dated January 16, 2007. The MLPA is dated January
23  19, 2007. The Officer Certifications are dated January 24, 2007.

24  64.    The PPM for the 2007-1 NIM Trust was issued on or about January
25  29, 2007 and the 2007-1 NIM Trust closed on or about that same day. The PPM
26  for the 2007-1 NIM Trust specifically incorporated by reference the prospectus for
27  the 2007-1 Trust. The principal balance of the notes issued by the 2007-1 NIM
28  Trust was approximately $73 million. An Option One senior officer signed the

Officer Certifications for the 2007-1 NIM Trust.  The Officer Certifications are dated January 29, 2007.

65.     The prospectus for the 2007-FXD1 Trust was issued on or about January 19, 2007.  The 2007-FXD1 Trust closed on or about January 30, 2007. The principal balance of the RMBS issued the by 2007-FXD1 Trust was approximately $817 million.  An Option One senior officer signed the MLPA, the Underwriting Agreement, the January 18, 2007 Form 8-K to which the MLPA and the Underwriting Agreement were attached, and the Officer Certifications for the 2007-FXD1 Trust. The MLPA and the Underwriting Agreement are dated January 19, 2007.  The Officer Certifications are dated January 30, 2007.

66.     The PPM for the 2007-FXD1 NIM Trust was issued on or about January 31, 2007 and the 2007-FXD1 NIM Trust closed on or about that same day. The PPM for the 2007-FXD1 NIM Trust specifically incorporated by reference the prospectus for the 2007-FXD1 Trust.  The principal balance of the notes issued by the 2007-FXD1 NIM Trust was approximately $22 million.  An Option One senior officer signed the Officer Certifications for the 2007-FXD1 NIM Trust.   The Officer Certifications are dated January 31, 2007.

67.     The prospectus for the 2007-CP1 Trust was issued on or about February 15, 2007.  The 2007-CP1 Trust closed on or about February 22, 2007. The principal balance of the RMBS issued by the 2007-CP1 Trust was approximately $756 million.  An Option One senior officer signed the MLPA, the Underwriting Agreement, the February 8, 2007 Form 8-K to which the MLPA and the Underwriting Agreement were attached, and the Officer Certifications for the 2007-CP1 Trust.  The MLPA and the Underwriting Agreement are dated February 15, 2007.  The Officer Certifications are dated February 22, 2007.

68.     The PPM for the 2007-CP1 NIM Trust was issued on or about March 8, 2007.  The 2007-CP1 NIM Trust closed on or about March 12, 2007.  The PPM for the 2007-CP1 NIM Trust specifically incorporated by reference the prospectus

for the 2007-CP1 Trust.  The principal balance of the notes issued by the 2007-CP1 NIM Trust was approximately $33 million.  An Option One senior officer signed the Officer Certifications for the 2007-CP1 NIM Trust.  The Officer Certifications are dated March 12, 2007.

69.    The prospectus for the 2007-2 Trust was issued on or about March 2, 2007.  The 2007-2 Trust closed on or about March 12, 2007.  The principal balance of the RMBS issued by the 2007-CP1 Trust was approximately $952 million. Option One senior officers signed the MLPA, the Underwriting Agreement, the March 1, 2007 Form 8-K to which the MLPA and the Underwriting Agreement were attached, and the Officer Certifications for the 2007-2 Trust.  The MLPA and the Underwriting Agreement are dated March 2, 2007.  The Officer Certifications are dated March 12, 2007.  Two of the Officer Certifications for the 2007-2 Trust were drafted for one Option One senior officer's signature but were signed by another Option One senior officer.

### 2.    The Misleading Statements

70.    In the prospectuses for the Trusts, Option One represented that it was obligated to repurchase or replace any mortgage loan in the pools collateralizing the RMBS for which there was a breach of a representation or warranty that materially and adversely affected the value of the loan or the RMBS investors' interest in the loan.

71.    All of the MLPAs for the Trusts represented that Option One did not have any reason or cause to believe that it could not perform its covenant obligations, including its repurchase obligations.

72.    All of the Underwriting Agreements for the Trusts represented that the prospectuses did not contain any misleading statements.

73.    All of the Officer Certifications for the Trusts represented that:

(1)     the officer had carefully examined the relevant MLPA and Option One's representations and warranties in the MLPA were true and correct in all material respects;

(2)     the officer had carefully examined the relevant underwriting agreement and Option One's representations and warranties in the underwriting agreement were true and correct in all material respects;

(3)     the officer had carefully examined the prospectus and nothing had come to the officer's attention that would lead the officer to believe that the prospectus contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements made in the prospectus not misleading; and

(4)     subsequent to issuance of the prospectus, there had not been any material adverse change in Option One's financial condition or results.

74.     All of the Officer Certifications for the NIM Trusts represented that:

(1)     nothing had come to the officer's attention that led the officer to believe that the PPM contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements made in the PPM not misleading; and

(2)     subsequent to issuance of the PPM, there had not been any material adverse change in Option One's financial condition or results.

75.     All of the representations in Paragraphs 70 through 74 were rendered misleading by Option One's failure to disclose:  (1) its deteriorating financial condition; (2) its inability to meet its loan repurchase obligations on its own; (3) that Option One was reliant on borrowings under the Line of Credit to meet its repurchase obligations; and (4) that its ability to repurchase or replace loans was dependent on Option One's continued ability to borrow under the Line of Credit.

### 3.    The Misleading Statements Were Material

76.    Option One's financial condition was important to investors in the Trusts and the NIM Trusts because it mattered to investors whether Option One could meet its loan repurchase obligations.

77.    Information about Option One's financial condition became more important to investors as the subprime mortgage market deteriorated and the amount of Option One's repurchase obligations climbed.

78.    Investors in the Trusts and NIM Trusts reviewed the prospectuses and PPMs for information about Option One's financial condition.

### 4.    Option One's Disclosure Failures

79.    Option One never disclosed to investors in the Trusts or the NIM Trusts Option One's deteriorating financial condition, its inability to meet its loan repurchase obligations on its own, that Option One was reliant on borrowings under the Line of Credit to meet its repurchase obligations, or that its ability to repurchase or replace loans was dependent on Option One's continued ability to borrow under the Line of Credit..

80.    As Option One knew or should have known, the prospectuses, PPMs, MLPAs, Underwriting Agreements, and Officer Certifications for the 2007-1 Trust, the 2007-FXD1 Trust, the 2007-1 NIM Trust, and the 2007-FXD1 NIM Trust failed to disclose Option One's deteriorating financial condition (including the January Waivers), that Option One could not meet its loan repurchase obligations on its own due to its deteriorating financial condition, or that Option One's ability to repurchase or replace loans was dependent on its continued ability to borrow under the Line of Credit.

81.    As Option One knew or should have known, the prospectus, PPM, MLPA, Underwriting Agreement, and Officer Certifications for the 2007-CP1 Trust and the 2007-CP1 NIM Trust similarly failed to disclose Option One's deteriorating financial condition (including the January Waivers), that Option One

1   could not meet its loan repurchase obligations on its own due to its deteriorating

2   financial condition, or that Option One's ability to repurchase or replace loans was

3   dependent on its continued ability to borrow under the Line of Credit.   The

4   prospectus, PPM, MLPA, Underwriting Agreement, and Officer Certifications for

5   the 2007-CP1 Trust and the 2007-CP1 NIM trust did include a generic risk factor

6   that a number of subprime loan originators had recently experienced serious

7   financial difficulties, including bankruptcy, and that the difficulties resulted, in

8   part, from declining markets for the originators' loans and from loan repurchase

9   claims.    However, the disclosures failed to disclose that Option One was

10  experiencing similarly serious financial difficulties and, rather, could be interpreted

11  as giving the impression that Option One was not experiencing such financial

12  difficulties.

13      82.   As Option One knew or should have known, the prospectus, MLPA,

14  Underwriting Agreement, and Officer Certifications for the 2007-2 Trust

15  supplemented the disclosures made in the 2007-CP1 Trust and the 2007-CP1 NIM

16  Trust with only the general warning that Option One may not be able to meet its

17  loan repurchase obligations.  The disclosures failed to disclose that Option One

18  already could not meet its loan repurchase obligations on its own due to its

19  deteriorating financial condition or that Option One's ability to repurchase or

20  replace loans was dependent on its continued ability to borrow under the Line of

21  Credit.  Instead, the prospectus for the 2007-2 Trust supplemented the disclosures

22  made in the 2007-CP1 Trust and the 2007-CP1 NIM Trust with only the general

23  warning that Option One may not be able to meet its loan repurchase obligations.

24      83.   During Option One's due diligence calls with the Underwriters, no

25  Option One employee disclosed that Option One could not meet its loan

26  repurchase obligations on its own due to its deteriorating financial condition or that

27  Option One's ability to repurchase or replace loans was dependent on its continued

28  ability to borrow under the Line of Credit.

84.     On the dates that Option One employees participated in Option One's due diligence calls with the Underwriters and signed the MLPAs, the Underwriting Agreements, and the Officer Certifications, they knew or should have known about Option One's deteriorating financial condition (including the January Waivers and the potential need for the April Waivers), that Option One could not meet its loan repurchase obligations on its own due to its deteriorating financial condition, and that Option One's ability to repurchase or replace loans was dependent on its continued ability to borrow under the Line of Credit.

### 5.     Option One Obtained Money By Means of Its Misstatements

85.     Option One received cash proceeds from the sale of RMBS issued by the Trusts and the NIM Trusts.

86.     As discussed above, Option One did not fully disclose all of the risks of investing in the Trusts and the NIM Trusts.  Had these risks been fully disclosed, investors may have chosen to purchase RMBS collateralized by loans originated by companies other than Option One or may have negotiated more favorable purchase terms.

### CLAIM FOR RELIEF

### MISREPRESENTATION IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a)(2) of the Securities Act

87.     The Commission realleges and incorporates by reference paragraphs 1 through 86 as if fully set forth herein.

88.     Option One, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.   Option One negligently engaged in the fraudulent conduct described above.

90.   By engaging in the fraudulent conduct described above, Option One violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### Violations of Section 17(a)(3) of the Securities Act

91.   The Commission realleges and incorporates by reference paragraphs 1 through 86 as if fully set forth herein.

92.   Option One, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

93.   Option One negligently engaged in the fraudulent conduct described above.

94.   By engaging in the fraudulent conduct described above, Option One violated, and unless restrained and enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining Option One and its agents, servants, employees, attorneys, and those persons in active concert or participation with Option One, who receive actual notice of the order by personal service or otherwise, from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

**II.**

Enter an order requiring Option One to disgorge all ill-gotten gains that Option One received from the violations alleged herein, together with prejudgment interest thereon;

**III.**

Enter an order requiring Option One to pay a civil penalty pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t].

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**V.**

Grant such other and further relief as this Court deems appropriate and necessary.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission demands that this case be tried to a jury on all issues so triable.

Dated: April 24, 2012                    Respectfully submitted,

                              **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

                              JOHN B. BULGOZDY

22

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV12- 633 JST (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY